, I'm a member of the Kendall Law Group out of Dallas, Texas, and it has been my privilege to represent the plaintiff appellate, in this case, Alvin Jackson. Simply put, the district court should not have granted summary judgment on Coach Jackson's race and retaliation claims. Mr. Scott, before we get started, I don't believe it's raised as an issue in this case, other than concerning the, I'll just call it the due process hearing provided by the school district, but how have administrative remedies been exhausted vis-a-vis the EEOC or some other state agency, assuming one is applicable? A charge of discrimination was filed with the Equal Employment Opportunity Commission, and a right to sue was received. Thank you. The district court went through the prima facie analysis properly, determined that Coach Jackson had established both his prima facie race and retaliation claims, but when it reached the pretext phase, the court simply missed the evidence of pretext, and that evidence starts with the timing. In August 18th of 2011, Coach Jackson approached Cade Smith about concerns concerning race discrimination. At that time, Coach Smith- Now, on that particular date, the 18th of August, Jackson says he did bring up race discrimination vis-a-vis this other coach. She denies he brought it up, so we just got a straight factual issue here? We have a fact question there. Coach Jackson went in and spoke with Cade Smith, who was his associate principal, told him he was having a problem with Coach Ryder over the summer. He thought it was race related, and he wanted to go to HR and file a complaint. Smith told him, and this is Smith's testimony, we don't need to do that yet. We don't need to go there. I'll handle it. Wait a minute. But she denies he brought up race discrimination. She just says, as I understand her version, he simply said, I'm having problems with him or something. Cade Smith denies that he brought up race. Coach Jackson says, I specifically mentioned race. That was in August. Is that the only genuine dispute of material fact we need? No. Well, that's a good one. That's a real good one. But that's just the first one, because at that time, when he mentions that, he's told, don't do anything. So there's fact question number one. He comes in, speaks with Coach Smith. Coach Smith denies that he admits that they met, but he said he didn't mention race. We have the same issues two months later with Sylvia Palacios. Let me ask you this. In Smith's version of the event where she said you don't need to go to HR, I'll handle it, does she admit she told him that? I don't know if Smith is man or female. It's a male. It's a male. Did Mr. Smith admit in his deposition, I told him I would handle it without HR? Smith's testimony says in the fall of 2011, Coach Jackson complained to him about Mr. Ryder. Coach Jackson told him he wanted to file a complaint with Human Resources, and Smith told Jackson not to. We don't need to go to HR just yet. Smith admits that? Smith admits that. But he says he never mentioned race. Coach Jackson specifically says he mentioned race. So that's in August of 2011. Three weeks later on September 8th, Mr. Smith gives Coach Jackson a walk-through in his classroom and starts downgrading his teaching abilities. Right. Now, as I understand it, the school district claims that even though Smith gave Jackson a proficient evaluation with no negatives at the end of the 2010-2011 school system, you know, like a secret codicil or something on a treaty where he had his concerns but basically was saying, well, we just wanted to make him feel good and make him feel comfortable before we really made him toe the mark. Now, is that in writing or is that just his testimony? That's just his testimony. So there's nothing, no secret codicil in writing? No. That's not only Smith's testimony. That was to some degree Palacios's as well. Palacios is the principal? Is the principal. And Palacios is over all the teachers. Palacios is responsible for making recommendations on termination over all the teachers in the school. And we recreated this. I tried to recreate this in pages 17, 18, 19, 20, and 21 of our brief. The April 2011 review where he is judged fully proficient and then alongside the one that's given two months after he complains of race discrimination where suddenly he falls completely off the map as a teacher. In April, he receives on the first domain 15 points. In August, two months after the school year starts, he's down to 8. On the second domain in April, he's at 29. You've got all that in your brief. Okay. Also, supposedly, when Jackson had a meeting with the principal, Palacios, on 31 January 2012, somebody claims that Palacios told Jackson, well, you're just not a good fit. You know, you've come from another school district, and you just don't meet our standards. Now, is that in writing, or is that just again? Word of mouth. All right. Do they dispute that? Is it disputed that Palacios told Jackson that? To some degree. What Coach Jackson said is Palacios told him, you're not a good fit for FISD, but you're a better fit for DISD. Dallas. Yeah. FISD is predominantly white. Dallas. Suburb of Dallas. It's a distant suburb of Dallas. It's predominantly white. DISD is 95% black and Hispanic. Now, in her testimony, she says she did tell him, I believe she admits that she told him he was not a good fit. She denies that she said you're a better fit in Dallas. Another possible genuine dispute of material facts. Absolutely. Absolutely, Your Honor. And that's important because if you look, one of the cases that I've, and I don't know if I have it in the brief, and I apologize, Medina v. Ramsey-Steele, which is 238F3-674, which was an opinion from Judges Garza, Stewart, and Dennis. In that particular case, when the plaintiff applied for a position, he was told he didn't have the right ingredients. He wasn't told he wasn't qualified, but he was told he didn't have the right ingredients. That's the exact same thing we have here with Palacios telling Coach Jackson. She didn't say to him, you're just not a good enough teacher out here. She told him, you're not a good fit. And that is significant evidence that the court in the Medina case found created a genuine issue of material fact on the retaliation. Now, after this, again, I call it a due process hearing where they gave him a total of 45 minutes to present his entire case. I understand it that Coach Jackson filed twice what we would call back in the olden days a non-suit. Was that in writing? Yes, it was. And it's on file? Is it in the record? I believe it is, Your Honor. I don't believe. Is it in the record? Yes, it is. All right. So we've got two written notices of filing the non-suit, which I note that the school district doesn't even mention in its brief. Is that crystal clear that when you file a non-suit, you take yourself out of that process and won't be subject to collateral estoppel? If you look at the education code, the education code says in a proceeding before the commissioner you have the right to withdraw the appeal at any time. And that in the law, in the administrative code, that trumps the Texas rules of civil procedure where once you've rested your case, you can't do that. This was not a proceeding, quote, before the commissioner, but it's my understanding that this individual is treated in line with the commissioner. So I don't know how you would argue that you could withdraw it before the commissioner at any time, but you can't do it before the hearing officer. It doesn't make a lot of sense. Well, I noticed that Judge Schell, in saying that it did not apply as collateral estoppel, did not rely on the notice of non-suit. He simply relied on the lack-of-due process. That's correct, because he had a couple days' notice of the hearing, a couple days' notice of the witnesses, 45 minutes to present his case. And the most important part is they never produced the evidence of comparators until a year after this case was on file. Summary judgment had been filed. We had responded. They had replied. They fought to produce the evidence of comparators. And it's obvious why they did, because there are notes in the walkthroughs of the comparators that are similar to Coach Jackson's and, in some cases, far worse than Coach Jackson's. And those individuals never were placed on TINAs for their teaching abilities, were never not. Give your best record example to support your claim that far worse than Coach Jackson's. If you look at the reviews of Coach Steele, who is the head basketball coach, Coach Jackson was the assistant basketball coach, 1349 through 1370 of the record. And I will read them from our brief. I'll just pick out the best one, because in a quick review, it seemed to me that they aren't similarly. In outcome, you aren't contesting the facts apply of the walkthrough results as to your client. I don't see that in your brief you're saying those were not correct, nor do I see you arguing that those, if true, would be grounds to not renew. Your argument instead is others similarly situated were as bad or worse but didn't get, right? That's correct. Okay. So I'm asking you for the best example of a worse deficiency. Students are disengaged, not authentically engaged. Student in the back of the computer had his headphones in, not sure if he was listening to them or not. Against school policy to have electronics out and in use in the classroom. This class needs more structure. Provide alternative assignments for students who finish activities projects faster than others. Students should remain on task for the entire class period. That's Coach Steele page 1355 of the record. They have attempted to distinguish Coach Steele on a couple of grounds that, frankly, are specious. First off, they said, well, he had different appraisers. At the end of the day, it doesn't matter because Palacios is the one who makes the decisions over non-renewals. The second part is they said that he taught science and Coach Jackson taught social studies. They're all subject to the same standards as teachers. It doesn't matter what they're teaching. The third one, which I think is a pretty good indication of how desperately they're trying to get away from the comparators, they said, well, Coach Jackson was an assistant coach and Steele was the head coach. There's nothing in the record that shows that Coach Jackson was non-renewed because of his coaching abilities. What kind of a coach he was or what he coached has absolutely no relevance to the analysis here, yet they're trying to draw distinctions based on that. That takes similarly situated and nearly identical to the point of ludicrous because, as the district court noted, we'd never be able to find a coach that had been a teacher and a coach teaching the same subjects, coaching the same sports, and there for the same period of time. There's only one of him. There's only one person who's a cross-country coach and an assistant basketball coach. Under their theory, we'd never be able to show a comparator, and the district court properly noted that. The other evidence of pretext, Coach Jackson made complaints to no less than six different individuals, including the Ph.D., Dr. Bass, who's the head of human resources for Frisco ISD. There is no evidence anyone at Frisco ISD ever did anything to investigate a single one of his complaints. In fact, during the- Now, it seems logical, but what you're suggesting then is that there is their authority, case authority that stands for the proposition that failure to investigate or follow your own procedures is evidence of pretext. There is. There's a case that we've cited in the brief. It's the Motley case, and it is not a Fifth Circuit case, but it does talk about refusing to investigate complaints is evidence of retaliation, and it stands to reason that if someone comes in and complains of race discrimination to an assistant principal, to the principal, and to the director of human resources, that some type of an investigation would be open. Dr. Bass testified that based upon the documents- Well, at first she said Coach Jackson didn't give her anything. That was technically true. He didn't give it to her. He gave it to another HR person. She had it at the time she met with Coach Jackson. It had dates. It had names. It had incidents. She testified that he met with her on a Friday. On a Monday, she sent him a letter saying we're closing your investigation because you refused to provide us any information. On top of that, she said that we couldn't do any- She said when I looked at this, I didn't see evidence of discrimination, and when she was asked during her deposition- This is Dr. Bass. This is Dr. Bass. She is the head of human resources for Frisco ISD. During her deposition, she said that she would- She was asked, what would you need? What would you need to investigate? She said something that would show discrimination. Something in writing. I've been doing employment cases for 20 years, and I've never seen in writing one employee putting in an email or a letter, I refuse to work with this individual because he's black. That simply doesn't happen. For the 2011-2012 school year, what was the total number of teachers, including coaches, and of those, how many were black? For the 2011 school year, Coach Jackson was the only black coach and I believe the only primary- He was the only black coach and I believe the only core subject teacher at Frisco. There were no other black coaches. I do not know if there were other non-core teachers who were minorities, but I do know Coach Jackson was the only black coach and the only black core subject teacher at Frisco. Of the coaches and core teachers, how many that year? How many at that school? Total teachers and coaches? Yes. Well, the comparators that they- My time is up. Can I finish? Yes. Okay. The comparators that they gave us, there were four coaches. No, sir. How many- What was the total faculty number at the school? You say he's the only black coach slash core teacher of that group. How many white teachers? That is in- I believe Dr. Palacios testified there were somewhere between 100 and 120 teachers at the school. I believe that is- That's all right. Thank you. Why don't you look- Somewhere around page 385 of the record. If you have better information, you can tell us on rebuttal. May it please the Court. Mr. Crawford, why don't we have a genuine dispute of material fact here? Well, Your Honor- We're here on summary judgment. So why don't- Tell me why we don't have a genuine dispute of material fact. Certainly, Your Honor. As you know, this Court can affirm a summary judgment for any reason presented to the District Court. Here, the District Court found there was no evidence of pretext. And importantly, for this case- You're saying the Court said there's absolutely no evidence of pretext. No evidence in the summary judgment record of pretext. That's right, Your Honor. Not a bit. Not a scintilla. That's correct, Your Honor. All right. Now, the decision-maker here is the Board of Trustees. And important to putting this in context is the Education Code and the Chapter 21 non-renewal process, which was followed in this case. And the non-renewal process implicates three reasons to grant summary judgment. One, causation, prima facie causation. Two, pretext. And three, collateral estoppel. Here, the Board voted on April 9, 2012, to accept the recommendation to non-renew Mr. Jackson. The next day, the Board gave notice, as required under the Texas Education Code, to Mr. Jackson that that had happened. And that's important because under the Texas Education Code, if a teacher is not timely given notice of non-renewal, the teacher's contract is automatically renewed. And so this is a process the school board must go through. And once they give that notice, Mr. Jackson has the right as a teacher to demand an open public evidentiary hearing. And he did do that. He did that on April 23. And by law, the school board must give him that hearing within 15 days unless the parties agree to delay it in writing. And in this case, the school district specifically asked Mr. Jackson, would you agree to delay the hearing so that we can gather more evidence and further investigate these claims? Because he said the basis for my non-renewal is I think I was the subject of discrimination and retaliation. Mr. Jackson said under no circumstances will I agree to continue the hearing. And so by law, the hearing had to occur by May 8, 2012, unless Mr. Jackson agreed to delay it. And he didn't under any of your circumstances. And so that you can't fault him. In other words, a school teacher at that point, April, who wants to work in the fall? Oh, I'm not. So he's got a right to say no. And then he gets his hearing, which you aren't disputing. But do you agree with his statement now that the record shows that all the evidence of the comparators wasn't produced until after the hearing? Well, I would agree. Is that true or not? I would agree that the list of the comparator information was not given until after the hearing. But I would add, Your Honor, that under the Chapter 21 process, the hearing examiner had the right to subpoena all those documents and witnesses had Mr. Jackson asked him to. And so that ability to have that information present at the hearing was his. He had that ability. He chose not to avail himself to it. But within the Education Code, it specifically provides, or the Administrative Code specifically provides that the hearing examiner has the right to subpoena documents and witnesses. And so, again, if he felt that was important to give to the hearing examiner to show why he shouldn't be non-renewed, he had that opportunity. Now, so far, the first five minutes of your time, you're arguing on an issue that the district court essentially decided against you, right? The district court said he didn't have sufficient opportunity to litigate. So this is your allocation of time. Well, Your Honor, he said that in the context of collateral stoppage, where you have to be given an adequate opportunity to litigate. And we disagree with that. And I'll tell you about that in a minute. But for purposes of the decision-maker on who is making the decision to non-renew, that goes to causal link and pretext. It doesn't go to collateral estoppel. So when the district court was saying, I don't think he had a fair opportunity to litigate, he wasn't discussing it in terms of what the board knew or what the board didn't know or what the board relied on. Because here, the evidence is unequivocal, that the only evidence the school board relied on to non-renew Mr. Jackson was the findings and recommendations of the hearing examiner that was presented to them at a public hearing on June 8th, where Mr. Jackson was given notice of, or June 18th, and had the opportunity to come and present argument. Hadn't he filed two notices of, I'll use the term, non-suit prior to then? I agree with that, Your Honor. Why didn't you mention that in your brief? Well, I would have if I had a... Why didn't you mention that in your brief? I don't believe it's relevant to... So you're saying once you start the hearing, you can't non-suit? Well, for purposes of the education code and policy DFBB, which is a school district policy that allows for this process, it doesn't say that you can non-suit or you can't, or if you are, what the result is. And that's the problem we have here, Your Honor, is the school board has to either And Mr. Jackson chose to appeal his non-renewal based on what he said was improper treatment. And so he starts the process. Now, the board eventually has to decide, are we going to renew him or not renew him, regardless of whether he drops his appeal or not? And so what does the board have to rely on to make that decision? Well, here they'd already had a full evidentiary hearing in front of an independent fact finder authorized by both board policy and the education code. So they relied on that. And so he may non-suit it, and that might make the decision perhaps voidable. It certainly doesn't divest of jurisdiction. And yet Mr. Jackson chose not to go to the commissioner of education or the district court saying, you know what, I non-suited this. These recommendations and the school board's decision is void. They can't do it because I non-suited. He never did that. Once he's non-suited, he has no appeal right. That stops the appeal to the school board and then to some court in Texas. I don't know if that would be the case, Your Honor. Again, ultimately what he is appealing is the school board's decision to not renew. How long have you been the attorney for the school district? How long have I been the attorney? Yes, sir. A number of years, Your Honor. And you don't know whether a non-suit would take away his right to appeal? I don't believe it would. There could be reasons that you could appeal. What's the Texas case that holds that? I don't have one, Your Honor. I would just say that non-suiting does not divest the court of jurisdiction and it may make the decision voidable, but it doesn't make it void and Mr. Jackson never took the next steps to see that through. But again, Your Honor, the important concept that I would like to get across to you is that here for this circuit has clearly said that when we look at discrimination and we look at retaliation, we look at the final decision maker and that's the school board. I don't think you made that point in your brief, did you, where you said, well, that might have been discrimination by Smith or it might have been discrimination by Palacios, but it wasn't by the school board so you can't hold us liable. I don't believe you ever said that in your brief. Oh, yes, Your Honor. We said that there's no causal link and there's no pretext because the board didn't have notice. In fact, we cited the Texarkana. You never say, I don't believe, and I certainly can be wrong, because the school board discharged him. You can't look to what Smith or Palacios or others might have known. You never make that point, do you? I believe we do, Your Honor. I just will have to disagree with you. I believe we do make that. We'll check your brief. That's fine. Because I was looking for it. Okay, Your Honor. I believe we have said that, but I appreciate it. I think a very important document that the court needs to consider and look at, an important testimony, is what they call PDOS, the Professional Development Appraisal System, appraisal of Mr. Jackson in October of 2010, his first year. And the deposition testimony from Principal Palacios about the walkthrough she did during the first year. And that PDOS observation shows that in October of 2010, which is well before he made his report to Mr. Smith, that Mr. Smith had rated him as below expectations in one domain, which was domain four, which is management of student discipline, and rated him in domain one low enough that if he had just been two points off, he would have been put on a growth plan his first year. And so his observation before the report, the documented observation, shows that he was two points away from being on a growth plan the first year. And Ms. Palacios testified that she did a walkthrough that first year and found that he wasn't where he needed to be because she found that the students weren't engaged, they weren't focused, and they weren't learning. And so these sorts of evaluations that are talking about his teaching style in the classroom were made very similar to before the report. And by the way, it's also similar to the PDOS observations that we have from his prior school in Dallas ISD. Well, his first report in October of 2010, that's about six months before the annual evaluation? The summative was in April. That's correct, Your Honor. And that was done by Smith? That was, Your Honor. And so one of the issues on evidence of retaliation or pretext is that this is close in time, temporal proximity, to his report to Mr. Smith. And post Burlington, it doesn't have to be an ultimate employment decision, but it has to be adverse, and we have to look at the context. And so here, in context, Mr. Jackson got a negative PDOS appraisal from Mr. Smith, and he received a negative walkthrough from Ms. Palacios, but that did not deter him from later making the report. And that seems to be one of the critical analysis for the Court as to whether this is adverse for purposes of retaliation in temporal proximity. He had negative reports before appraisals, and it didn't deter him from making a report later. And so under the context of this case, those sorts of — Deter him? Who is the him? Mr. Jackson, from making a report later. The standard would be, is this the sort of action, a negative walkthrough? What report did Mr. Jackson make later? The report to Mr. Smith in August of 2011 that he says is his protected activity. He was receiving negative evaluations before he made that report. Wasn't his final evaluation before he made that report all proficient, the annual evaluation? It was, and it was explained by Ms. Palacios that that could have been lower, they chose not to make it lower. There's nothing in writing to that effect, just a little whispered between good old boys? Well, it was deposition testimony. It is what the facts of the case are, Your Honor. That's her claim, but there's nothing in writing to support that. That's correct. He was proficient on the April 2011 summative. That is correct, Your Honor. And when you use the term summative, you mean his annual evaluation. Correct. There are two types of PDOS forms. One is called the observation. One is called the summative. They look very similar, so that's why I'm trying to make that distinction. The October 2010 was the observation. The April that you and I are discussing was the summative. The summative can either be a continuation of the last observation or it can be an average of the observations from the year. In this case, his April summative was just taken as a continuation from his March observation. Who says that? Ms. Palacios in her deposition. But she didn't prepare the report. That was prepared by Smith. That's correct, Your Honor. Now, stepping back, I mean, the record is undisputed that Mr. Jackson, when he had friction with another coach, he went right to the principal, right? No, Your Honor. Who did he go to? He went to the associate principal, Mr. Smith. Discreetly, perfectly, appropriately, right? As I understand it, yes, Your Honor. So if a teacher's got friction, he does the right thing, he goes to them, and then does the record reflect that they never investigated? They told him, let's not send this to HR? The testimony was from Mr. Smith on this in his deposition. And what he said was that it was a friction between two coaches and they hadn't taken it to the athletic director yet, and so before he took it to HR, he asked him to take it to the athletic director first because it just appeared to be friction between two coaches. And so he said, Mr. Smith said, I asked him to take it to the athletic director. I then followed up with the athletic director, and he told me it was taken care of, and Mr. Jackson never complained to me, Mr. Smith, about it again, so I thought it was taken care of. And so to say he didn't investigate it I don't believe is correct. What he said was take it to the athletic director, and then he followed up, and then they get another complaint from Mr. Jackson about it. And Mr. Jackson's testimony is, I asked to go to HR, and Smith said, don't, I'll take care of it. That's so we've got the conflicting testimony there. We have Mr. Jackson's affidavit that he filed in summary judgment. We objected to numerous portions of it as being conclusory or without foundation. The district court denied those objections, and so it's in evidence as to what Mr. Jackson said. Our position is that those are conclusory statements, not proper summary judgment evidence. They don't claim they're inconsistent with his deposition. It is not inconsistent in the sense that they both agree that they met at this time frame and that Mr. Jackson complained about Mr. or Coach Ryder. What they do differ on is that Coach Smith said in his deposition race was never mentioned. It was a coaching conflict. They just weren't working well with each other, and that he needed to go to the athletic director. So that's where the difference is. My question is, normally if a deposition is taken and then an affidavit is subsequently submitted by the same, by the deponent, we will not look to the affidavit if the points made are inconsistent with the deposition. Generally, we give credence to the deposition, but I don't believe you claim here that parts of the affidavit for that purpose were, quote, inconsistent, close quote, with the deposition. Well, the affidavit and the deposition are two different people. It was Mr. Jackson's affidavit, Mr. Smith's deposition. Yes, sir. Mr. Jackson wasn't deposed? Not before summary judgment, no, Your Honor. So you didn't take his deposition? No, Your Honor. All right. Thank you. Do you have a case that stands for the fact that temporal proximity along with differential treatment is not evidence of pretext? It's not evidence of pretext. Yeah. As I understand the rule in this circuit is that for pretext, temporal proximity with other evidence of pretext is sufficient. Okay. So then the case, then it reduces, the correctness of the ruling reduces to whether or not we have differential treatment. Is it your position that the four comparators were not similarly situated or were not treated differently? Both. And first of all, I think under our analysis that we are talking about the wrong comparators. And the reason why I say that is because, again, we are looking at the decision maker here is the board. And the question is, has the board treated different similarly situated teachers from Mr. Jackson? And here there is no evidence that any other teacher came in front of the board for a non-renewal for violating a growth plan. Maybe in your brief, that's a distinction that I, too, hadn't noticed, that your argument hinges on this, the indirectness of the ultimate decision maker here, that we're not looking at Smith's action, he's not the retaliator, that your position is we have to just look at the school board to decide. That's correct, Your Honor. And, again, I do believe we've made that point in our brief. We've argued it under several places. One, the no causal connection. We said the board did not. Let me ask it then differently. If Smith were the actor, would you agree that this case could not end at summary judgment? If Smith were the final decision maker for purpose of argument? Yes. Given the facts. Yes. I would agree that then we have a question of fact as to his motives. But, again, here we have a lynchpin position. We have the board that is acting as the decision maker after a Chapter 21 process. And as the Mullinex-Texarkana case that we cite in our brief said, that the existence of this independent report, and I believe the court said attenuates the link connecting the protected activity and the adverse employment. Was that the district court's analysis as well? That in order to find no genuine issue of fact as to pretext, the court made this bifurcation you're asking us to? The only reason the court stated in his memorandum for pretext was that Mr. Jackson's only evidence of pretext other than temporal proximity was his own subjective belief that the — that his bad ratings, for lack of a better way of putting it, were incorrect. And that he thought Mr. Ryder was discriminating against him by not working with him because that's the first — he's the first guy that's ever done that, so it must have been because of his race. And so the court — the district court ruled on the pretext just saying that you've articulated a legitimate nonretaliatory reason, which is the reasons that the board gave for terminating him. You know, you didn't — you were deficient, you didn't get better, and you violated directives. I'm paraphrasing. And that's legitimate. And so then it comes — the burden shifts to pretext, and other than temporal proximity, Judge Schell ruled that he didn't have any other evidence of pretext other than subjective belief. And we do agree with that. How about the — Excuse me. Sorry. No, you go ahead. I thought you just told me you don't agree with that if it were just at the Smith level, that the evidence of the comparators would still contain — Well, then if we're looking at it at the Smith level as opposed to the board level, my answer would be that they are not similar. And the reason why they're not is because, as the Court's aware, they need to be nearly identical — not identical, but nearly identical. And things to take into consideration are appraisers, length of time as an employee, the content of your teaching courses if you're talking about evaluations. The Court still had a question. Well, I was simply going to ask about these very inconsistent walkthroughs and the number he was subjected to, 11, after he got the good evaluation at the end of the first school year. You don't think that's evidence of pretext? It could be evidence of pretext? I've asked you a question. Answer it. Yes, sir. No, for two reasons. One, Ms. Palacios testified that new teachers like Mr. Jackson had, by practice, increased walkthroughs. And, second, Mr. Jackson's increased walkthroughs, some of them were at his own insistence. Not all of them were negative. And when you're placed on a growth plan, that necessitates additional walkthroughs. And so that's why — That's interesting. When he was evaluated by persons other than Smith and Palacios, generally he got a proficient score. But it was when Smith and Palacios did the walkthroughs his second year, he got the negative scores. Well, again, I would disagree. Walkthroughs don't rate him proficient. That would be a PDOS observation, which Ms. Palacios and the law says are significantly different. Walkthroughs are not the same. How about filling us in on this PDOS? What does PDOS mean? Professional Development Appraisal System. It is — the Texas Education Code mandates that each teacher is appraised pursuant to this system. And it has rules and things that you have to do or don't do. Thank you, Your Honor. Judge Barksdale, there is — I believe counsel said that Coach Jackson asked for the additional walkthroughs. There is no evidence in the record that Coach Jackson ever asked for 11 walkthroughs. He did ask for one outside evaluator. He did not ask for additional walkthroughs. With respect to the walkthroughs, his first year in Frisco ISD, the year he didn't complain, he was subjected to three. The second year in Frisco ISD, after he complained, he was subjected to 11. The other four coaches were subjected collectively to 14. Coach Jackson had almost as many walkthroughs in that year as the other four coaches that they produced the evidence of, comparators, combined. He said they don't know — he's talking about he doesn't know what the proper comparator is. That's the — we ask for evidence of comparators. They produce that evidence. The idea that a school board can insulate itself from the discriminatory actions of the principal and the vice principal, who are the ones that set this in motion, who are the ones that turn in the recommendation to the board that this person be non-renewed, the idea that a board can insulate itself from those decisions is ridiculous. What about either authority or is your position that the record shows that their findings were the findings relied on by the board? Their findings were the findings relied on by the board. We would not have been at a hearing to go to the board had it not been for Palacios and for Smith. We would have never been there. It's sort of typical cat's paw. The only evidence that was given to the board was the evidence from the bad actors in the first place. They can't simply go, well, we didn't know anything about that, when the two people who are making the recommendation do know and are engaging in the discrimination. That is not the law that's never been the law. His brief tries to make that point subtly by saying, well, they weren't aware of discrimination because all they had were the findings and conclusions. Well, they did have a letter from Coach Jackson, as he admitted, saying this is a problem I'm being discriminated against and retaliated against. But, again, the bottom line is we'd never been at a hearing. We would have never been before the board had it not been for the discrimination of Smith and Palacios. All the board did was carry out the marching orders of these two individuals. Palacios testified that she runs the school. Wait a minute. Whoa, whoa, whoa. I'm sorry. I don't mean carry out the marching orders. They acted on the actions of Smith and Palacios. Did Smith and Palacios, I assume, testify at the due process hearing? They did, and it was a short 45 minutes for us. And during – yes, they did, yes. When you say short 45 minutes, did you during that hearing say we need to enlarge time? There was a request, and I believe there may have been a little bit of – I didn't attend the hearing. There was a request. I believe a little additional time was given, but then a request for additional more time beyond that was denied. And the reason – Is there a transcript of the hearing in the record in the summary judgment? Yes, there is, yes. And you had asked me earlier about the – is transcribed and is in the summary judgment record? I know portions of it are. I don't know if the entire thing is, but I know large portions of it are. You had asked me earlier about the number of teachers. Ms. Palacios, Principal Palacios, page 1055 of the record, she testified there were three to four other black teachers, and Coach Jackson was the only black coach. He – counsel for the district says, you know, I think we need to look at the PDOS. I agree. That's why we went to the process of replicating it in our brief, because in April his PDOS is outstanding. And in April he hadn't complained. The school year ends in May, so nothing's going on in June, July. In August he complains. In October his PDOS, or partial PDOS, stinks. He goes from being a fully proficient teacher to one who's terrible. And their argument that if he had just been one point lower, he might have been this, or if he – you know, if is not enough to get you past summary judgment. They filled out the PDOS. Coach Jackson had no role in it. If he had been so bad, they had every opportunity to tell him that in April. They didn't. They told him that he was doing a good job, he was proficient or exceeding expectations. Two months after he complains, and really the old passage of time there was the summer, so he wasn't doing anything in the summer. Two months after he complained, suddenly he is a completely inept teacher. That is evidence of pretext. I think the district court . . . The first walkthrough, was that Smith or Palacios, in the fall of 2011? The first walkthrough in the fall of 2011 was by Cade Smith, and that was done on September 8, 2011, three weeks after Coach Jackson complained of discrimination. My time has expired. Thank you. All right, thank you. Thank you both.